IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRUCE MURRAY,<br><br>Defendant. | CRIMINAL INDICTMENT<br><br>NO. 1:13-CR-134-TCB-GGB |

## FINAL REPORT AND RECOMMENDATION

Defendant Bruce Murray ("Defendant") is charged with two counts of being a felon in possession of a firearm, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 United States Code, Sections 922(g)(1) and 924(e)(1); 21 United States Code, Sections 841(a)(1) and 841(b)(1)(D); and 18 United States Code, Section 924(c)(1)(A). Pending before this court are Defendant's Motion to Suppress Statements, Motion to Suppress Evidence resulting from a warrantless seizure, and Motion to Suppress Evidence resulting from unlawful search warrant (Docs. 10, 11, and 20). Evidentiary hearings on these motions were held before me on September 5, 2013 (Doc. 38) and November 8, 2013 (Doc. 42). For the reasons discussed below, I recommend that Defendant's motions to suppress (Docs. 10, 11, and 20) be DENIED.

AO 72A
(Rev.8/8
2)

# I.   FACTS

## A.   March - April 2012 Investigation

In March 2012, Atlanta Police Detective Matthew Patire ("Det. Patire") began investigating 810 Metropolitan Parkway ("the residence") after receiving a tip that a neighbor suspected that narcotics activities were taking place at the residence. (Doc. 42 at 4; Doc. 20-1 at 2). In that month, police stopped several vehicles that left the residence, and seized marijuana in glassine baggies from those vehicles. (Doc. 20-1 at 2-3). On March 17, 2012, Police obtained and executed a search warrant at the residence. (Id. at 3-4). Officers located and seized from the residence marijuana packaged in baggies, a gun and $1,121 in currency. (Id. at 3). The main target of Det. Patire's investigation, a black male known as Carlos or "Lo" (who Det. Patire later identified as Defendant) was not present at the time of the search and was not arrested. (Id. at 3-4).

Det. Patire continued his investigation, and in April 2012, several more seizures of marijuana were made from individuals who had purchased marijuana at 810 Metropolitan Parkway. (Doc. 20-1 at 4). Several of the marijuana purchasers identified the seller as a person meeting the description of Defendant. (See id.). During a surveillance in April 2012, Det. Patire observed Defendant enter the residence through the front door. (Id.). Another search warrant was executed on April 27, 2012;

2

however, on this occasion, no contraband was found, and Defendant was not present. (Id. at 5). Tammy Stone, Defendant's girlfriend who lived with him, told Det. Patire that Defendant had packaged up all of the marijuana and taken it out of the residence that morning. (Id.).

### B.   March 2013 Investigation, Traffic Stop and Arrest

Det. Patire resumed his investigation of 810 Metropolitan Parkway on March 19, 2013. (Doc. 42 at 5-7). He again saw vehicles pull into the driveway of the residence and leave a short time later. (Doc. 20-1 at 5). He believed that this type of activity indicated that narcotics was still being sold at the residence. (See id.).

At one point that day, Det. Patire observed a silver Infiniti pull into the driveway of the residence, stay for a few minutes and then leave. (Doc. 42 at 9). Det. Patire gave a description of the car and the clothing of the passenger to a patrol unit in the area. (Id.). He asked the officers in the patrol unit to look for the vehicle. Det. Patire did not realize at the time that Defendant was a passenger in the Infiniti. (See Doc. 42 at 9-11).

Atlanta Police Officers Moncrief and Stephens were on patrol, received Det. Patire's request, and planned to stop the vehicle in order to help Det. Patire with his investigation if they developed probable cause to make a stop. (Doc. 38 at 15-16). They saw the Infiniti, ran its license plate, learned that it had an expired tag, and pulled it over. (Id. at 8). Officer Stephens approached the driver's side of the Infiniti,

3

requested the driver's license, and went back to the patrol car to check it. (Id. at 8, 90, 96).

Meanwhile, Officer Moncrief approached the passenger side of the vehicle. (Doc. 38 at 8, 18, 20). Defendant was in the front passenger seat. (See id. at 10). When Officer Moncrief was standing approximately one foot from the car he smelled marijuana through the passenger side window.[1] (Id. at 8, 20-21). When he looked down into the car, Officer Moncrief saw a plastic bag protruding from Defendant's pant pocket. (Id. at 8, 27). Based on his training and experience, Officer Moncrief believed that the bag was packaging for marijuana. (Id. at 27-28). Officer Moncrief asked Defendant for his name and date of birth and ordered him to step out of the car. (Id. at 8-9, 28). Defendant at first ignored the order, and Officer Moncrief asked him again to step out of the car. (Id. at 9).

After the second request, Defendant quickly moved his left hand from where it had been resting on his thigh and reached towards the center console of the vehicle. (Doc. 38 at 9, 29). Officer Moncrief believed this to be an aggressive move. (Id.). To

---

[1] In making this finding, I have considered Defendant's arguments that Officer Moncrief was not credible and did not, in fact, smell marijuana. Defendant points out that Officer Stephens did not smell marijuana while he was talking to the driver of the Infiniti. However, Officer Moncrief was closer to Defendant, and thus, closer to the marijuana. Moreover, Officer Stephens later did smell marijuana when Defendant had been taken out of the car and the marijuana had been removed from his person. I did not find Defendant's arguments on this point to be persuasive.

4

ensure his safety, Officer Moncrief then unholstered his taser, pointed it at Defendant, and ordered Defendant to get out of the vehicle. (Id. at 9). Before Defendant left his vehicle, he volunteered that he had a gun in his possession. (Id. at 10, 35 39). As Defendant was stepping out of the vehicle with his hands in the air, Officer Moncrief observed marijuana in the plastic bag in Defendant's pocket. (Id. at 10, 38). Officer Moncrief then searched Defendant's person and found several bags of marijuana and a gun in Defendant's pockets. (Id. at 46). From earlier investigations, Officer Moncrief knew that Defendant was a convicted felon and was not lawfully able to carry a firearm.[2] (Doc. 38 at 39-40, 42). Defendant was placed under arrest. (Id. at 112).

### C. March 20, 2013 Search Warrant

On March 20, 2013, Det. Patire applied for and received a search warrant for 810 Metropolitan Parkway S.W., Atlanta, Georgia, from a Fulton County State Court Judge. (Doc. 20-1). Det. Patire's affidavit in support of the application for the search warrant contained the details of the March and April 2012 investigations, search

---

[2] I have considered Defendant's arguments that Officer Moncrief did not in fact know that Defendant was a convicted felon. Defendant points out that Officer Stephens testified that neither he nor Officer Moncrief knew that Defendant was a convicted felon before he was arrested. However, Officer Stephens was not in a position to know what Officer Moncrief knew about Defendant's criminal history. Thus, I did not find Defendant's arguments on this point to be persuasive. I also reject Defendant's argument that Officer Moncrief did not in fact see on Defendant's person a package that was likely to be a bag of marijuana.

5

warrants, and seizures. (See id.). The affidavit then describes events that took place in March 2013, specifically that:

- On March 19, 2013, Det. Patire observed four to five vehicles pull into the driveway of 810 Metropolitan Parkway and leave after three to five minutes, activity that the detective believed was indicative of narcotics transactions;

- An Infiniti that pulled in and exited the residence was stopped and the passenger [Defendant] was found to have three separate bags of marijuana, a gun and $559 in currency in mostly small denominations indicative of narcotics transactions.

(Id. at 5).

On March 27, 2013, Atlanta Police Officers executed the search warrant. When the officers approached the residence, Defendant was standing in an area at the end of a gravel driveway adjacent to the house. (Doc. 42 at 19). Defendant was detained and placed in handcuffs. (Id.). Officers brought Defendant to the porch of the residence and had him sit on a couch on the porch while the search was being conducted. (Id. at 20). Defendant's seventeen-year-old-son and Tammy Stone, Defendant's girlfriend and the mother of his son, were also detained on the porch. (Doc. 38 at 54, 68; Doc. 42

6

AO 72A
(Rev.8/8
2)

at 28). During the search, officers recovered marijuana and a handgun from the residence. (Doc. 38 at 54).

Agents of the United States Bureau of Alcohol Tobacco and Firearms ("ATF") had been working with Det. Patire at the time of the execution of the search warrant. ATF Special Agent Allen McLeod and two Task Force officers were on standby a few blocks away from the residence while the warrant was being executed, and were called over to the residence after a firearm was located during the search. (Doc. 38 at 53-54). When SA McCleod arrived at the residence, he heard Defendant say that everything in the house was his. (Id. at 55). SA McLeod told Defendant that he would like to talk to him, but wanted to do it the right way and in the right setting. SA McLeod and the Task Force officers then brought Defendant inside the residence. (Id.).

Once inside the residence. SA McLeod read Defendant his Miranda[3] rights. (Doc. 38 at 55-57). Defendant said that he understood his rights. (Id. at 57). When SA McLeod asked Defendant if he was willing to waive his rights and talk with him, Defendant paused, thought about it, and said that he did not want his family to get into any trouble for the things that belonged to him. When SA McLeod asked for a yes or no response, Defendant stated that he probably should have an attorney present with

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

him.  At that point, SA McLeod asked no further questions, and he took Defendant back to the couch on the front porch with his son and girlfriend.  (Id.).

As officers continued to search the house, Defendant continued to volunteer that everything in the house was his.  (Doc. 38 at 58).  During the search, Defendant stopped SA McLeod and told him that he would like to speak with him.  (Id. at 58-59).  SA McLeod then took Defendant to the side of the house and told him that he still had the right to have an attorney present.  Because Defendant had previously requested an attorney, SA McLeod decided to record the interview.  (Id.).  In the recorded interview,[4] SA McLeod confirmed that Miranda rights had been read to Defendant. (Gov. Ex. 2; Doc. 38 at 62).  SA McLeod asked Defendant if he now wished to talk without an attorney present.  (Gov. Ex. 2; Doc. 38 at 62). Defendant at first qualified his answer by saying that he wanted to talk if the officers would let his family members go.  (Id.).  SA McLeod told Defendant that it was not up to him to decide what would happen to the family members; that SA McLeod would tell the Atlanta Police Department what Defendant said, and they would determine whether the family members would be charged.  (Gov. Ex. 2; Doc. 38 at 61; Doc. 42 at 20).  Defendant believed that if he confessed that the gun and marijuana were his, that his family

---

[4]Government Exh. 2 is a recording of the interview.  Defendant's post-hearing brief contains a transcription of the relevant portions of the recorded interview. (Doc. 52 at 19-20).

8

members would not be locked up.  (Doc. 42 at 42).  Defendant then went on to answer SA McLeod's questions.  (Gov. Ex. 2, Doc. 38 at 61).  Among his statements, Defendant said that he had bought the gun from someone on the street.  (Gov. Ex. 2).

Additional facts are discussed in context below.

## II.   DISCUSSION

Defendant contends that (1) he was unlawfully seized on March 19, 2013, when officers pulled over the silver Infiniti, and any evidence derived from that seizure should be suppressed; (2) he was unlawfully seized at his residence on March 27, 2013, and any evidence derived from that seizure should be suppressed; (3) the warrant authorizing the search of 810 Metropolitan Parkway was unsupported by probable cause and based on unlawfully seized evidence; and (4) Defendant's March 27, 2013 statements were coerced and not freely and voluntarily made.  Each of these arguments is discussed below.

### A.   The stop and seizure on March 19, 2013

Defendant contends that Officer Moncrief did not have probable cause to arrest Defendant when he ordered him out of the Infiniti on March 19, 2013.

As an initial matter, the Court notes that Defendant does not dispute that the Infiniti in which he was a passenger had an expired tag and that driving with an expired tag violates Georgia traffic law.  When an officer observes a traffic offense, a traffic

9

stop does not violate the Fourth Amendment even if the officer has ulterior motives in initiating the stop. Whren v. United States, 517 U.S. 806, 810, 813 (1996). Thus, the stop of the Infiniti was lawful.

As part of a traffic stop, an officer is permitted to question the passenger and order the passenger out of the car. Maryland v. Wilson, 519 U.S. 408, 410 (1997). I credit Officer Moncrief's testimony that he smelled marijuana and observed packaging consistent with marijuana possession on Defendant's person. (See Doc. 38 at 8, 20-21, 27). Officer Moncrief also observed Defendant make a furtive move towards the console, and, when Officer Moncrief pulled out his taser, Defendant admitted that he had a gun. (See id. at 9-10, 29, 35, 39). Under these circumstances, Officer Moncrief was justified in ordering Defendant out of the vehicle and in conducting a limited protective search for concealed weapons. See Terry v. Ohio, 392 U. S. 1, 30-31 (1968) (holding that officers may conduct a pat-down search for weapons if they reasonably believe that the suspect is armed and dangerous); Adams v. Williams, 407 U. S. 143, 146 (1972) (same).

The pat-down search revealed that Defendant was carrying several bags of marijuana on his person. (See Doc. 38 at 10). Therefore, Officer Moncrief had probable cause to arrest him for possession of that marijuana. I also credit Officer Moncrief's testimony that he knew that Defendant was a convicted felon, having been

briefed about Defendant's criminal history by Det. Patire during prior investigations of Defendant. (See Doc. 38 at 39-40, 42). Thus, Officer Moncrief also had probable cause to arrest Defendant for being a convicted felon in possession of a firearm. In short, there were no constitutional problems with the search and seizure on March 19.

**B.    The seizure of Defendant on March 27, 2013**

Next, Defendant contends that the officers executing the search warrant on March 27, 2013, were not authorized to detain him.

In Michigan v. Summers, 452 U.S. 692 (1981), the Supreme Court held that officers executing a search warrant have authority to detain the occupants of the premises while the search is conducted. Id. at 705. In Summers, the officers had stopped and detained a person located immediately outside the premises described in the warrant. Id. at 693-94.

In this case, at the time he was detained, Defendant was standing in a gravel area behind a paved driveway adjacent to his home. (Doc. 42 at 18-19; Def. Ex. 4). The paved driveway leads to the gravel area. (See id.). Defendant was approximately ten to fifteen yards from the house. (Id.). Defendant contends that the gravel area is actually part of the property belonging to the warehouse next door. (See Doc. 42 at 26).

11

Defendant relies on Bailey v. United States, 568 U.S. ___, 133 S.Ct. 1031 (2013), in which the police conducted surveillance at an apartment for which they had obtained a search warrant. 133 S.Ct. at 1036. The police observed Bailey and another man leave the apartment and drive away in a car. Id. There was no indication that the men were aware of the officers' presence or had any knowledge of the impending search. Id. The police followed the men and stopped them approximately one mile from the target location. Id. The Supreme Court held that the considerations in Summers that supported the detention of occupants during a search do not extend to detentions of individuals who are beyond the immediate vicinity of the place to be searched. Id. at 1042-43.

The Supreme Court in Bailey did not define "immediate vicinity"; however, it did list the following as factors for the court to consider in determining whether a person was detained within the immediate vicinity of the premises to be searched: (1) the lawful limits of the premises; (2) whether the occupant was within the line of sight of his dwelling; and (3) the ease of reentry from the occupant's location. Id. at 1042. Here, it was reasonable for the officers to assume that the gravel area at the end of the driveway to the house was within the lawful limits of the premises. The gravel area was the logical parking spot for the house. Moreover, even if the gravel area was outside the property lines, Defendant was only ten to fifteen yards away from his

house. There was no structure or landscaping between Defendant and his house. (See Def. Exh. 4).  Defendant was within the line of sight of his house and could easily re-enter the house from his location and interfere with the search.  Under these circumstances, I find that Defendant was within the immediate vicinity of the premises to be searched and thus, under Summers and Bailey, was lawfully detained while officers executed the search warrant.

### C. The search on March 27, 2013

Defendant contends that the affidavit for the search warrant for 810 Metropolitan Parkway that was executed on March 27, 2013, failed to establish probable cause because it was largely based on stale information and failed to establish Defendant's nexus with the home.

The task of a judicial officer from whom a search warrant is requested is simply to make a practical, common sense decision of whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause deals with probabilities, not technicalities.  Thus, the judicial officer must take into account the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Brinegar v. United States, 338 U.S. 160, 175 (1949).  "Courts reviewing the legitimacy of search warrants

should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 462 U.S. at 236-37).

The affidavit supporting a search warrant must allege criminal activity occurring close enough to the time the warrant is issued to justify a finding of probable cause at that time. Sgro v. United States, 287 U.S. 206, 210 (1932). There is no particular time after which information becomes stale. United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000). Staleness is an issue that must be decided on a case-by-case basis. Id.

The affidavit in support of the search warrant in this case did include the details of Det. Patire's investigation in March and April of 2012. (See Doc. 20-1). Standing alone, this information would probably be stale. However, the affidavit also included current information, in particular, that on March 19, 2013, Det. Patire observed four to five vehicles entering and departing the premises within a forty-five minute period. (See id. at 5). In his 2012 investigation, Det. Patire had confirmed that similar traffic into and out of the residence was for the purpose of purchasing marijuana from someone at the residence. (See id. at 3-5). Also, Det. Patire's affidavit related that a

14

traffic stop of the Infiniti that left the residence on March 19, 2013 resulted in the seizure of three separate bags of marijuana and a gun. (See id. at 5-6). Under the applicable standards, the information in the affidavit was sufficient to provide probable cause to search the residence.

Defendant also contends that the affidavit was deficient because it did not sufficiently link Defendant to the residence. However, the affidavit had only to supply probable cause that contraband would be found in the residence. It did not have to establish Defendant's presence or connection to the residence. I conclude that the warrant was supported by probable cause and that the search of the residence was fully compliant with the Fourth Amendment.

In any event, even if the search warrant affidavit were lacking in probable cause, this case would be governed by United States v. Leon, 468 U.S. 897 (1984). In Leon, the Supreme Court recognized a good faith exception to the exclusionary rule for searches that are conducted pursuant to warrants. Id. at 922. The Court held that suppression of evidence would have no deterrent effect where an officer, acting with objective good faith, has obtained a search warrant from a judge or magistrate and has acted within its scope. See id. The good faith exception applies unless: (1) the magistrate was misled by false information; (2) the magistrate wholly abandoned the judicial role; (3) the affidavit supporting the warrant was so lacking in indicia of

15

probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant is so facially deficient that the executing officers could not have reasonably presumed that it was valid. United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002).

Here, there is no evidence that the Fulton County State Court Judge relied on false information or wholly abandoned the judicial role. The affidavit was not wholly lacking in indicia of probable cause, as it described the results of the 2012 drug investigation as well as more recent activity at the residence that was consistent with a pattern of drug dealing. (See Doc. 20-1). Finally, the warrant was not deficient on its face, as it specified with particularity the place to be searched and the things to be seized. (See id. at 7). Accordingly, even if the affidavit were lacking in probable cause, it would be admitted under the good faith exception of Leon.

### D.   Defendant's statements on March 27, 2013

Defendant concedes that agents read him his Miranda rights. Defendant initially invoked his right to have an attorney, and SA McLeod stopped talking to him at that point. Defendant later initiated contact with SA McLeod by telling him that he wanted to talk with him. (Doc. 37 at 58-59; Doc. 42 at 32). SA McLeod began his second conversation with Defendant by reminding him of his Miranda rights. (Doc. 38 at 62).

16

Defendant testified that in between his first and second conversation with SA McLeod, Det. Patire and another unidentified Atlanta Police Officer told him that if Defendant wanted Tammy Stone and his son to be free, that he would have to "take the rap" for what was in the house. (Doc. 42 at 29, 41). Ms. Stone also testified that while she and Defendant were on the porch, Det. Patire told Defendant that if he were willing to confess to the "weed" and gun found in the house that the police would not lock up Ms. Stone and Defendant's son. (Doc. 42 at 46). In contrast, Det. Patire testified that he never spoke to Defendant on the day that the search was being executed. (Doc. 42 at 43). I find that the testimony of Defendant and Ms. Stone on this point is not credible. Specifically, I find that neither Det. Patire nor any other officer promised Defendant that Ms. Stone and his son would be released if Defendant confessed.

In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that, once a suspect has invoked his right to counsel, custodial interrogation must cease unless an attorney is present or the suspect reinitiates contact with the investigators. Id. at 484-85. Here, additional questioning was permissible because defendant reinitiated conversation with SA McLeod and made the incriminating statements only after he was reminded of his Miranda rights. See United States v. Gonzalez, 183 F.3d 1315, 1324 (11th Cir. 1999)(finding valid waiver despite prior invocation of right to counsel when

17

defendant's wife told police he wanted to talk to them), superseded by regulation on other grounds as stated in United States v. Diaz, 248 F.3d 1065, 1107 & n.59 (11th Cir. 2001); Oregon v. Bradshaw, 462 U.S. 1039, 1042-46 (1983)(plurality finding that suspect, who had previously invoked his right to counsel, knowingly and intelligently waived his right to counsel when he asked police, "Well, what is going to happen to me now?" and then executed an additional waiver of his Miranda rights on the following day before he confessed).

Defendant also suggests that his statements were not voluntary because they were motivated by SA McLeod's suggestion that Defendant's statements could determine what happened to his girlfriend and son. Although Defendant may have been motivated to waive his rights by a desire to protect his girlfriend and son, such motivation does not render his waiver involuntary. SA McLeod did not secure Defendant's waiver of his rights by making any promises about what would happen to his girlfriend and son. The Fifth Amendment is not violated by "moral and psychological pressures to confess emanating from sources other than official coercion." Oregon v. Elstad, 470 U.S. 298, 304-05 (1985). In sum, the evidence established that Defendant knowingly and intelligently waived his rights.

AO 72A
(Rev.8/8
2)

### III.  CONCLUSION

I find that Defendant was lawfully stopped and arrested on March 19, 2013, that law enforcement officers lawfully searched his residence on March 27, 2013, pursuant to a search warrant that was based on probable cause, and that Defendant was advised of his rights and knowingly and intelligently waived his right to remain silent.  In sum, I **RECOMMEND** that Defendant's Motion to Suppress Statements, Motion to Suppress Evidence, and Motion to Suppress Evidence resulting from unlawful search warrant [Docs. 10, 11, and 20] be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 14th day of April, 2014.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)