IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION FILE |
| | ) | |
| BRUCE MURRAY, | ) | NUMBER 1:13-cr-134-TCB-GGB |
| | ) | |
| Defendant. | ) | |

**O R D E R**

This case is before the Court on Defendant Bruce Murray's objections [64, 66] to Magistrate Judge Brill's Report and Recommendation [8], which recommends that Murray's motions to suppress [10, 11, 20] be denied. Also pending before the Court is Murray's motion for a de novo evidentiary hearing on his motions to suppress [67].

## I. Legal Standards

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982)).[1] This review may take different forms, however, depending on

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B

whether there are objections to the R&R. The district judge must "make a de novo determination of those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

The Court has conducted a careful and complete de novo review of the R&R and Murray's objections. Having done so, the Court finds that

panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing the continuing validity of *Nettles*).

[2] *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

Magistrate Judge Brill's factual and legal conclusions were correct and that Murray's objections have no merit.

## II. Background

Murray is facing several criminal charges, including possessing with intent to distribute marijuana and illegally possessing a firearm. Inculpatory evidence was discovered during a March 19, 2013 traffic stop and a March 27 search of his home. During the search Murray also made incriminating statements. He seeks suppression of both the evidence and the statements.

## III. Discussion

This order will proceed as follows: the facts of the traffic stop will be discussed, followed by analysis of Murray's arguments as to why it was improper. Then the facts of the search will be discussed, followed by analysis of his arguments as to how the search warrant was faulty, how he was unlawfully detained during the search, and how admission of statements he made during the search would violate his constitutional rights.

### A. The Traffic Stop

Murray first argues that he was improperly stopped and patted down during the March 19, 2013 traffic stop.

#### 1. Facts of the Traffic Stop

In March and April 2012, a year before the traffic stop, the Atlanta Police Department investigated Murray's home and suspected it was a hub of drug-dealing activity. APD officers received tips that drugs were being dealt there, they watched cars quickly come and go from the home and seized marijuana from the occupants of those cars, and they found marijuana during two searches of the home.

On March 19, 2013, an APD detective was surveilling the home and again he saw several cars quickly come and go. From one car he saw a passenger go inside, return to the car and leave, all in just a few minutes. Believing that the car and its passenger were involved in drug activity, the detective gave a description of both to a nearby patrol unit. Two APD officers, Moncrief and Stephens, saw the described car a short time later,

discovered that its registration was suspended, and stopped it.[3] The parties disagree about the facts of the traffic stop after this point.

This is the government's version: Stephens and Moncrief approached the car on the driver's side and the passenger's side, respectively. Moncrief smelled marijuana and saw a plastic bag protruding from the passenger's pocket. He twice ordered the passenger out of the car, but the passenger did not comply. Instead the passenger quickly moved his left hand from his thigh toward the center console. Moncrief considered this to be an aggressive gesture and drew his taser. He ordered the passenger to show his hands. The passenger did so, told Moncrief that he had a gun, and exited the vehicle. Once out of the car, Moncrief saw that the plastic bag in the passenger's pocket contained marijuana. Moncrief patted him down and found marijuana and a firearm. The passenger was Murray.

---

[3] Murray argues that the officers stopped the car not because its registration was suspended but because they knew it was the subject of a drug investigation. Even if that were so, it would not make the stop improper. An officer's subjective motivation for making a traffic stop is irrelevant if he observes unlawful activity. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[F]oreclos[ing] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."); *see also Draper v. Reynolds*, 369 F.3d 1270, 1275 (11th Cir. 2004) ("[B]ecause the detectives 'possessed probable cause to believe that a traffic violation had occurred,' the stop complied with the Fourth Amendment regardless of their desire to intercept drugs." (quoting *United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997))). Moncrief and Stephens had probable cause to believe that the car had a suspended registration, so the stop was lawful.

Murray, for his part, paints a different picture. He emphasizes the actions of officer Stephens. After stopping the car, Stephens approached the driver's side, spoke with the driver, took his license through the window, and returned to the police car. Stephens did not smell marijuana, did not see a plastic bag in Murray's pocket, and did not recall Murray making aggressive movements. Stephens only smelled marijuana and noticed the plastic bag after Murray exited the vehicle.

In short, the disagreement is this: the government says Moncrief smelled marijuana, saw a plastic bag in Murray's pocket, and saw Murray make an aggressive movement; Murray says Moncrief is lying. Murray claims that Moncrief knew Murray was the suspect of a drug investigation, so he ordered him from the car for that reason and later concocted the explanation about the marijuana odor, the plastic bag and the aggressive movements. Murray points to Stephens's testimony that he smelled and saw nothing. Murray argues that if Stephens did not smell marijuana, Moncrief could not have; that if Stephens did not see a plastic bag, Moncrief could not have;[4] and that if Stephens did not observe an

[4] Aside from the alleged conflict between Moncrief and Stephens's testimony, Murray advances two separate arguments for why Moncrief was lying about seeing a plastic bag protruding from Murray's pocket while he was in the car. Both are meritless.

aggressive movement, Moncrief could not have. Based on this apparent conflict in the two officers' testimony, Murray argues that ordering him out of the car was improper because Moncrief lacked probable cause or even reasonable suspicion to believe that Murray was engaged in criminal activity. In a word, Murray asks the Court to disbelieve Moncrief.

As an initial matter, the Court notes that the officers' statements are not actually contradictory because each described only his own observations. Moncrief said he smelled and saw something; Stephens said he himself did not. Stephens did not (and could not) say that Moncrief smelled and saw nothing. One person's observations during an event can

---

First, Murray makes hay of Moncrief's testimony that he saw the plastic bag in Murray's pocket while "out of the view of the passenger." [66] at 4. Murray claims that it was "physically impossible from [that] vantage point"—out of the view of the passenger—for Moncrief to have seen a bag of marijuana in Murray's pocket. But Murray mischaracterizes Moncrief's testimony. Moncrief did not testify that he could not see the passenger. Just the opposite: he stated unequivocally that he was able to observe the passenger. [38] at 8 (stating that he was "try[ing] to observe to keep my eyes on both the passenger and the driver"). By saying he was "out of the view of the passenger," Moncrief meant only that the passenger could not see *him*. *See id.* at 20-21 ("I was standing approximately 12 inches away from the vehicle but . . . near the door handle of the passenger side.").

Second, Murray argues that Moncrief could not have seen the plastic bag because it was in his right pocket, nearer the passenger door, and Moncrief's view of Murray's right pocket was blocked by the door. Murray says that from his vantage point directly beside the passenger door, Moncrief could not possibly have seen down the inside of the door to Murray's right pocket. But Moncrief testified that he was only twelve inches from the vehicle, *id.* at 20-21, so he could have seen down the inside of the door. Whatever he could see, his testimony that he saw the plastic bag is but one of several justifications for ordering Murray out of the car; he also smelled marijuana and saw Murray make an aggressive movement.

differ from another's without either being a liar. It is plausible that the officer on the passenger's side—nearer the marijuana—would smell it, while the officer on the driver's side—farther from it—would not. It is also plausible that the officer on the passenger's side would be more observant of the passenger's movements and the contents of his pockets than the officer on the driver's side. Indeed, Stephens said as much, testifying that he was "focusing on the driver," not the passenger. [38] at 96.

What is more, Moncrief remained beside the stopped car while Stephens returned to the police car, making Moncrief the only officer watching the passenger during that time. Only then did Murray make the aggressive movement with his hand. *Id.* It is not surprising that Stephens, sitting in the police car, did not see the aggressive movement.

Stephens did not say that there was no marijuana smell, that there was no plastic bag, or that Murray did not make an aggressive movement. He merely said that he did not observe any of those things. That does not foreclose the possibility that Moncrief did.

### 2. Ordering Murray from the Vehicle

All that said, the question of whether Moncrief actually smelled marijuana or saw anything suspicious is beside the point. An officer may

order a passenger out of a car during a traffic stop as a matter of course even if the passenger has engaged in no unusual or suspicious activity. *Maryland v. Wilson*, 519 U.S. 408, 412 (1997). In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam), the Supreme Court established that per se rule with respect to the driver of a stopped car, and in *Wilson* the Court extended the rule to passengers. *Wilson*, 519 U.S. at 410 ("In this case we consider whether the rule of [*Mimms*], that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle, extends to passengers as well. We hold that it does.").

Murray acknowledges this precedent, but claims that *Wilson* is inapplicable here. He argues that the *Wilson* Court was motivated by the risk posed to officer safety in that particular case. And because there was no officer-safety risk here, *Wilson*'s rule should not apply. The *Wilson* Court did indeed discuss the "weighty interest in officer safety" in reaching its holding. *Wilson*, 519 U.S. at 413. But whatever the *Wilson* Court's justification for its holding, its rule is categorical. It did not require any specific showing of danger before an officer can order a passenger out of a lawfully stopped car. The Court wrote that an officer may do so "as a matter of course," *Wilson*, 519 U.S. at 410, without any reference to a

requirement that the officer's safety is at risk in a given case. *See United States v. Clark*, 337 F.3d 1282, 1285 (11th Cir. 2003) ("[A]n officer may order a passenger out of a vehicle during a stop for a traffic infraction without violating the Fourth Amendment *although there is no articulable reason to detain the passenger*." (emphasis added) (citing *Wilson*, 519 U.S. at 413)).

Whether the officers were in danger is thus irrelevant; the *Wilson* rule applied. And under that rule, even if Moncrief is lying and he smelled no marijuana, saw no plastic bag, and observed no furtive movements, he was empowered to order Murray from the car "as a matter of course," *Wilson*, 519 U.S. at 410, for no reason at all. Moncrief did not violate Murray's Fourth Amendment rights by ordering him out of the car even if he smelled and saw nothing, and even if there was no risk to his or Stephens's safety.

### 3. Patdown Search of Murray

After Murray exited the car, Moncrief conducted a patdown search and found marijuana and a gun. Murray claims that the patdown was illegal even if stopping him and ordering him from the car was not.

Not so. After Moncrief ordered Murray to put his hands up, Murray said he had a gun. This gave Moncrief reasonable suspicion that Murray

was armed, thus permitting him to conduct a limited protective search for weapons. *See Arizona v. Johnson*, 555 U.S. 323, 332 (2009) ("[O]fficers who conduct routine traffic stop[s] may perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." (second alteration in original) (citations and quotation marks omitted)); *see also United States v. Durrah*, 384 F. App'x 970, 971 (11th Cir. 2010) (per curiam) ("[T]he Supreme Court has held, in the context of a lawful traffic stop, officers may perform a pat-down search of any passenger who they believe to be armed and dangerous, even if the officers do not have reason to believe the passenger is involved in criminal activity." (citing *Johnson*, 555 U.S. at 327)).

In *Durrah*, the Eleventh Circuit upheld a patdown of a passenger in a lawfully stopped car. Because the passenger "made a furtive movement with his right hand towards his hip and did not immediately comply with [the officer's] orders to show his hands," the officer had "reason to believe [the passenger] was armed and dangerous" and could "order [him] out of the vehicle and conduct a pat-down search of his person for weapons." *Durrah*, 384 F. App'x at 972.

This case is nearly identical to *Durrah* and features an even stronger set of facts supporting the patdown's legality. Not only did Murray make a furtive movement and initially fail to comply with Moncrief's orders to exit the car, he also *said he had a gun*. This gave Moncrief reason to believe Murray was armed—even more reason than the officer had in *Durrah*—and rendered lawful the subsequent patdown.

Murray says that Moncrief did not know he was a felon, so could not have known that his possession of the gun was unlawful. As far as Moncrief knew, according to Murray, he was a lawful possessor of the gun.[5] But as *Durrah* shows, an officer need not believe that a passenger in a stopped car is violating the law; he need only reasonable suspicion that the passenger is armed and dangerous. Moncrief had ample reason to suspect that Murray was both: namely, Murray's failure to comply with orders to exit the car, his aggressive movements, and his admission that he was carrying a gun. The patdown of Murray was lawful. And once Moncrief patted down Murray

[5] Again Murray relies on Stephens's statements about what Moncrief knew. But Moncrief himself testified that he knew Murray was a convicted felon. [38] at 42. Stephens testified only that Moncrief did not say anything about Murray's felon status until the end of the traffic stop. *Id.* at 106-07. Even if the legality of the patdown depended on Moncrief knowing that Murray was a felon—which it did not—this is, again, not a factual inconsistency. Stephens could not know what Moncrief knew; he could know only what Moncrief said. Moncrief may have known that Murray was a felon but felt no reason to inform Stepehens until the end of the stop.

and discovered marijuana, he had probable cause to arrest him, regardless of whether he knew Murray was a felon.

Moncrief and Stephens's stop of the car was lawful because its registration was suspended. Moncrief's order that Murray exit the car was lawful as a matter of course under *Wilson*. Moncrief's patdown of Murray was lawful under *Johnson* because he reasonably suspected that Murray was armed and dangerous. Because each step of the encounter was permissible, the inculpatory evidence will not be suppressed. Murray's objections to this portion of the R&R are overruled, and it will be adopted as the Court's order.

### B. The Search of Murray's Home

Murray next argues that the search of his home was improper. He claims that the search warrant was not supported by probable cause, that he was illegally detained during the search, and that admitting incriminating statements he made during the search would violate his Fifth and Sixth Amendment rights.

### 1. Facts of the Search

#### a. The Warrant

On March 20, 2013, the day after the traffic stop, the APD detective who had been investigating Murray's home signed an affidavit in support of a search warrant. The affidavit contained details about both the year-old, 2012 investigation of Murray's home and about the more recent, 2013 investigation. The detective stated that during both investigations he saw multiple cars arriving and departing the home in a short period of time, which was indicative of drug activity. The detective stated that on March 19, 2013—just a day before he swore out the affidavit—he observed similar activity. He also described the March 19 traffic stop in which a car that had just left Murray's home was stopped and Murray was found inside with marijuana and a gun.

#### b. The Search

On the strength of the detective's affidavit, APD obtained a search warrant on March 20, which its officers executed on March 27. As they approached Murray's home on that day, they saw Murray standing outside on a gravel area abutting the driveway. He was between ten and fifteen yards from the home. They handcuffed him and placed him on the porch

while they conducted the search. Also detained and placed on the porch were Murray's girlfriend and their seventeen-year-old son. The officers found marijuana and a handgun in Murray's home.

### c. Murray's Statements

An ATF agent who had been assisting APD with the investigation was on the scene during the search. He heard Murray say out loud several times that everything in the house was his property. The agent asked Murray if he would like to talk, then walked him inside and sat him in a chair. The agent Mirandized Murray and asked him if he wished to waive his rights. Murray responded: "I just don't want my family to get into any trouble for the things that belong to me." [38] at 57. The agent asked again whether Murray wished to waive his rights and said that he needed to give a "yes" or "no" response. Murray responded that "he thought he should probably have an attorney with him." *Id.* The agent stopped the conversation and took Murray back to the porch.

The agent resumed assisting APD with the search. During this time he heard Murray continue to be "very vocal about everything being his." *Id.* at 58. Five or ten minutes later, with no prompting from the agent, who testified that "[a]t no time did he reach out to [Murray] again" to ask him

questions, Murray said to the agent, "I would like to talk with you now." *Id.* The agent took Murray to the side of the home and told him he was going to record their conversation.

During the recorded interview, the agent asked Murray whether he had just been read his rights; Murray said yes. The agent asked Murray whether it was his "choice now . . . to . . . retract your statement and you wanna talk without an attorney present?" [52] at 19 (transcript of recording). Murray responded that he would speak without an attorney if the agent would let his family go. The agent said it wasn't up to him. He said he was going to ask Murray a few questions and give Murray's answers to the APD, and "that" would determine whether his family would be charged. *Id.* at 20.[6]

The agent told Murray he wanted him to be honest and asked him whether he knew about a gun found in the home. Murray said yes and described it as a .38 caliber. Murray continued to insist that his family knew nothing about the marijuana and the gun. The agent said that if his

[6] It is not entirely clear what the agent meant when he said "that" would determine whether Murray's family would be charged. The entire relevant portion of the transcribed interview is as follows: "[I]t's not up to me. I'm just going to tell you—I'm going to ask you a few questions and *that's* gonna determine—probably—I'm gonna tell the Atlanta Police Department, and *that's* going to determine whether they[] [Murray's family] [a]re held culpable and charged with it." [52] at 20 (emphasis added).

family knew nothing about the marijuana and the gun, they could not be charged in connection with it. At the end of the conversation, the agent asked Murray whether the police had threatened him in any way. He responded, "naw."

### 2. Murray's Challenge to the Warrant

Murray challenges the sufficiency of the search warrant on several grounds. None is persuasive.

#### a. Staleness

Murray first argues that the APD detective's affidavit could not establish probable cause because the information in it was stale. He objects to the fact that the affidavit contained information about the year-old, 2012 investigation of his home. As the magistrate judge explained, that information alone would likely be too stale to establish probable cause. But the affidavit also contained information about the March 2013 investigation. During that more recent investigation—conducted mere days before the affidavit was executed—the detective saw cars coming and going from Murray's home in rapid succession, which he testified was indicative of drug activity. That investigation also led to the traffic stop during which Murray was found with marijuana and a gun shortly after leaving his home.

That evidence meets the standard for probable cause. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (whether a fair probability exists that contraband or evidence of a crime will be found at the place to be searched). And because the affidavit contained information about an investigation that was only days old, it was not stale. *See United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000).

### b. Nexus Between Murray and the Home

Murray vaguely claims that the warrant was invalid because it did not describe the nexus between him and the home. He claims that being stopped in a car with a small amount of marijuana after leaving the home does not provide sufficient evidence that he was responsible for the contents of the home or the activities of its occupants. The stop shows only that he purchased marijuana from the home—like many other drivers whom the detective watched coming and going—and not that he was responsible for the drug dealing going on there.

But the warrant need not establish any connection between Murray and the home; all that is required is a showing of "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The detective made this showing. He spelled out in

detail how he watched numerous cars come and go from the home in rapid succession. A year before the search, the drivers of many of those cars were found with marijuana, and several of them admitted to buying marijuana from the home. And just a day before the officer swore out the affidavit, Murray was stopped after leaving the home and was found with marijuana. Even if, accepting Murray's version of events, he was just a purchaser of marijuana, the events described by the detective provided probable cause to believe that marijuana would be found at his home.

### c. Fruit of a Poisonous Tree

Murray next argues that if the warrant did establish probable cause, it did so by referring to the fruit of a poisonous tree, namely evidence found during the disputed March 19, 2013 traffic stop. The affidavit did refer to evidence from the stop to make out probable cause, and Murray thinks the traffic stop was improper and evidence from it should be suppressed. This, he claims, should render the affidavit invalid because it relied on inadmissible evidence to show probable cause. But because every aspect of the traffic stop was proper, this argument fails.

#### d. Good Faith

Even if Murray were correct and the warrant was faulty for any of the above reasons, the Court would not suppress evidence obtained during the search. This is because the officers acted in good faith. If officers conduct a search in reasonable reliance on a warrant that later is determined to be lacking in probable cause, courts should not suppress the fruits of the search. *United States v. Leon*, 468 U.S. 897 (1984). *Leon*'s good faith exception to the exclusionary rule applies unless (1) the magistrate who issued the warrant was misled by false information that the affiant knew or should have known was false; (2) the magistrate wholly abandoned his judicial role; (3) the affidavit supporting the warrant was so lacking in indicia of probable cause that it would be entirely unreasonable to rely on it; or (4) the warrant was in some way so facially deficient that the executing officers could not reasonably have assumed that it was valid. *Id.*; *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). None of those situations is present here.

### 3. Murray's Challenge to his Detention During the Search

Murray next argues that he was illegally detained during the search. He claims that because the warrant did not authorize seizing him, and

because he was not in the immediate vicinity of the home, it was illegal to detain him during the search. He is wrong.

Murray was lawfully detained incident to the execution of the search warrant. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home."). Officers need not have a specific suspicion that a detainee is involved in criminal activity or poses a danger to them; the power to "detain incident to a search is categorical." *Bailey v. United States*, 133 S. Ct. 1031, 1037-38 (2013) (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)).

Murray was standing on the gravel driveway of a neighboring property when the police arrived. In *Summers* and its progeny, however, the detainee was found "within or immediately outside" the residence when the police executed the search warrant. *See Bailey*, 133 S. Ct. at 1038 (collecting cases). Murray suggests that because he was neither inside nor immediately outside his home, he falls outside the scope of *Summers*.

Murray believes his situation is governed by *Bailey*, not *Summers*. *Bailey* circumscribed the outer limit of permissible detentions incident to the execution of search warrants. In *Bailey*, just before the police executed a search warrant on a residence, two officers saw Bailey leave in a car. *Id.* at 1036. They followed him and pulled him over nearly a mile away. He said he lived at the residence being searched, and the officers arrested him. The Supreme Court held that this was beyond the scope of *Summers* because Bailey was outside "the immediate vicinity of [the] premises to be searched." *Id.* at 1043.

But the *Bailey* Court declined to "further define the meaning of immediate vicinity" because Bailey himself was so far away from the residence. *Id.* at 1042. It explained that, "in closer cases," courts considering whether a detainee was within the immediate vicinity of a searched premises should "consider a number of factors," including "the lawful limits of the premises, whether the [detainee] was within the line of sight of his dwelling, the ease of reentry from the [detainee]'s location, and other relevant factors." *Id.*

Neither the Eleventh Circuit nor any district judge in this district has faced a "closer case[]" such as this one since *Bailey*.[7] But applying the *Bailey* factors compels the conclusion that Murray was in fact in the immediate vicinity of his home.

The first *Bailey* factor does admittedly militate against that conclusion. According to Murray, he was standing on his neighbor's gravel driveway. That would presumably put him beyond the "lawful limits of [his home]." *See id.* But the other two *Bailey* factors support the conclusion and the lawfulness of the detention: Murray was only ten to fifteen yards away and was thus easily "within the line of sight" of the home, and he could have easily reentered the home from his location.[8] *See id.*

[7] Only a handful of courts nationwide have applied the *Bailey* factors in a published order. *See, e.g.*, *Gaines v. United States*, No. 13-CV-2157, 2014 WL 1891340, at *4 (C.D. Ill. May 12, 2014) (holding in dicta, on habeas review, that the petitioner was legally detained when he drove by the residence being searched); *United States v. Gildersleeve*, No. 11CR211A, 2013 WL 1908049, at *7 (W.D.N.Y. Apr. 19, 2013), *report and recommendation adopted at* 2013 WL 4046293 (W.D.N.Y. Aug. 8, 2013) (finding detention unlawful under *Bailey* where the defendant was walking away from the searched premises, where the officers intended to detain the defendant incident to the search irrespective of his location, and where the three *Summers*/*Bailey* interests, *see infra*, were not implicated).

[8] Murray suggests that the third *Bailey* factor undermines the legality of the search. He says he could not have reentered the home because the police were nearby and would have prevented him from doing so. But the presence of police alone cannot turn this factor in Murray's favor. After all, the police are present during every search. Under Murray's view, no person could ever easily reenter a searched premises. That would strip the third *Bailey* factor of all meaning and cannot be the law.

Furthermore, the principles motivating the Supreme Court's jurisprudence in this area support the conclusion that the detention was lawful. The *Bailey* Court explained the three justifications for detentions incident to the execution of search warrants: officer safety, facilitating the completion of the search, and preventing flight. *Id.* at 1038. Each interest was implicated here. First, Murray could have jeopardized officer safety from his location. He was only ten to fifteen yards from the home, and he was known to carry a gun based on the traffic stop only days earlier. Second, from his location he could have "interfere[d] with the execution of the search warrant," or "hid[den] or destroy[ed] evidence, s[ought] to distract the officers, or simply g[ot] in the way." *Id.* at 1040. Third, from his location he could have fled or "rush[ed] the search, causing unnecessary damage to property or compromising [the search's] careful execution." *Id.*

The Court agrees with the magistrate judge. Murray was within the immediate vicinity of his home and was thus properly detained incident to the execution of the search warrant. Murray's objections to this portion of the R&R will be overruled, and it will be adopted as the Court's order.

### C. Murray's Challenge to Admitting His Statements

Murray finally argues that admitting the statements he made during the search of his home would violate his Fifth and Sixth Amendment rights.

#### 1. Facts of Murray's Statements

The parties apparently do not dispute that Murray was in custody when the officers detained him and placed him on the porch. As required, the ATF agent read Murray his *Miranda* rights, *Miranda v. Arizona*, 384 U.S. 436 (1966), before conducting the first round of questioning. The parties also apparently do not dispute that in the face of this questioning Murray initially invoked his right to counsel. The agent properly ceased questioning at that point, as mandated by *Edwards v. Arizona*, 451 U.S. 477 (1981). Questioning could not resume unless Murray "initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485.[9]

The agent later resumed questioning. During that second round of questioning Murray waived his right to counsel and made incriminating statements. The parties disagree about whether the resumption of

---

[9] Questioning could also resume, of course, if Murray was given the opportunity to consult with counsel. *See Cervi v. Kemp*, 855 F.2d 702, 705 (11th Cir. 1988). But that prong of *Edwards* is not relevant here, so will not be discussed further.

questioning was proper and whether the ensuing waiver was valid. The government asserts that the resumption was proper because Murray initiated the questioning by saying he wished to speak with the agent, and the waiver was valid because it was knowing, intelligent and voluntary. Murray disagrees and says he was badgered into resuming the questioning, rendering any subsequent waiver invalid.

### 2. Applicable Law

In this context, when an accused has invoked his right to counsel and later waives that right and communicates with the police without a lawyer, his post-invocation waiver is only valid if the accused—rather than the police—"initiate[s] [the post-invocation] communication, exchanges, or conversations . . . ." *Id.* The police cannot obtain a valid waiver by "badgering . . . a defendant into waiving his previously asserted *Miranda* rights." *United States v. Gomez*, 927 F.2d 1530, 1537 (11th Cir. 1991) (citing *Minnick v. Mississippi*, 498 U.S. 146 (1990), and *Michigan v. Harvey*, 494 U.S. 344 (1990)). The Eleventh Circuit has written that the "law in this area is clear:" after an accused invokes his right to counsel, interrogation must cease, and "*[o]nly* if the *accused* . . . voluntarily initiates further

communications can the agents pursue more information and interrogation." *Id.* (emphasis in original).

*Edwards* thus established a bright-line rule: a post-invocation waiver is invalid unless the accused initiates the post-invocation questioning. *Cervi*, 855 F.2d at 705-06 (collecting cases). Only if that bright-line rule is met can a waiver be valid. *Dunkins v. Thigpen*, 854 F.2d 394, 397 (11th Cir. 1988).

But complying with *Edwards*'s bright-line rule does not end the inquiry. Satisfying *Edwards* does not necessarily render a waiver valid in the same way that contravening *Edwards* makes a waiver per se invalid. *See id.* ("Even if a defendant has initiated contact with the police after requesting counsel, any statements made are still inadmissible unless they are the product of a knowing and voluntary waiver." (collecting cases)). In other words: *Edwards* is a necessary but not sufficient condition to find that a post-invocation wavier is valid. A waiver that satisfies *Edwards* still must be voluntary, knowing and intelligent to be valid. *Id.*; *see also Miranda*, 384 U.S. at 444.

For a waiver to be valid, a court must find by a preponderance of the evidence, *Colorado v. Connelly*, 479 U.S. 157, 168 (1986), that the

"relinquishment of the right" was both voluntary—"in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"—and made with the "requisite level of comprehension," i.e., with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In determining the validity of a waiver, a court considers "the totality of the circumstances surrounding the interrogation." *Id.*

### 3. Discussion

The Court must answer two questions: *first*, was *Edwards* satisfied? That is, did Murray initiate the second conversation with police, or was he badgered into it? And *second*, if *Edwards* was satisfied, was his waiver voluntary, knowing and intelligent?

#### a. *Edwards* Was Satisfied Because Murray Initiated the Questioning

*First,* was *Edwards* satisfied? Did Murray initiate the second round of questioning with the ATF agent, in which he waived his right to counsel and made incriminating statements? Or was he badgered into it?

Consider the conflicting testimony presented to the magistrate judge. Murray and his girlfriend testified that after the first round of questioning,

APD officers prodded Murray to admit to possessing the contraband they were discovering in the search. He testified that APD Detective Patire told him he should confess so that his girlfriend and son would not be charged. According to Murray, Patire said that "if [he] wanted to let Tammy Stone [his girlfriend] and Tavaris [his son] be free, [he had] to take the []rap for what's in the house." [42] at 29. He testified that Patire, who had been investigating Murray for some time and knew his girlfriend was on probation, said that his girlfriend would go to jail if he did not implicate himself. *Id.* at 30-31. Murray's girlfriend largely corroborated his testimony. She testified that Patire said to Murray that if he was "willing to confess to the [marijuana] and the gun that[] [were] in the house," the officers wouldn't "lock up Tavaris and . . . Stone." *Id.* at 46.

Patire denied this wholesale. He testified unequivocally that he did not tell Murray to claim the guns and drugs in order to keep his girlfriend and son from going to jail. *Id.* at 43. In fact he testified that he did not speak to Murray at all on the day of the search. *Id.* And another officer's testimony cast doubt on the veracity of Murray and his girlfriend's claim that Patire badgered Murray. That second officer (Fisher) testified that Patire was actively searching the home and was not talking to Murray. *Id.*

at 50. Fisher also testified that Patire was wearing a balaclava during the search. *Id.* That testimony contradicted the statements of Murray's girlfriend, who said that Patire was not wearing a mask. More fundamentally, the second officer's testimony that Patire was wearing a mask undermined the claim that Murray and his girlfriend were able to identify Patire as the one who badgered Murray to confess.

Given this testimony, did Murray initiate the second conversation with the ATF agent, or was he badgered by Patire? This is, at bottom, a credibility determination. Murray and his girlfriend said Patire badgered him after he invoked his right to counsel; Patire said he did no such thing. The magistrate judge credited Detective Patire's testimony and refused to credit Murray and his girlfriend's testimony to the contrary.

Credibility determinations are "typically the province of the fact finder." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). On appeal, "a trial judge's . . . choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony." *Id.* (alteration and emphasis in original) (quoting *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990)). When reviewing a credibility determination, the Eleventh Circuit will "defer

to the magistrate judge's determinations unless his understanding of the facts appears to be 'unbelievable.'" *Id.* (quoting *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985)).

Having reviewed the entirety of the record, the Court agrees with Magistrate Judge Brill.[10] The testimony credited by the magistrate judge is neither exceedingly improbable nor unbelievable. Detective Patire's testimony on this score is more credible than the testimony of Murray and his girlfriend. Murray was not badgered after he invoked his right to counsel, and he initiated the conversation with Patire. That satisfies *Edwards*.

#### b. Murray's Waiver Was Valid

*Second*, having found that the *Edwards* rule is met, the Court asks: was Murray's waiver a valid one? To be valid, it must have been knowing, intelligent and voluntary. *Miranda*, 384 U.S. at 444. The magistrate judge held that it was, and the Court agrees.

---

[10] The Court need not rehear testimony to adopt a magistrate judge's credibility determination, even on de novo review. *United States v. Thompson*, 422 F.3d 1285, 1297 (11th Cir. 2005); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."). For this reason, Murray's motion for a de novo hearing will be denied.

Murray insists that the police coerced him into waiving his rights and making the incriminating statements by threatening his girlfriend and son with arrest. Murray looks for support to a line of Supreme Court jurisprudence stemming from *Connelly*, 479 U.S. at 163, declaring that waivers are involuntary if they are brought about by "coercive police conduct." *Id.* at 163-64.

But the police conduct here was not coercive. The interview between the ATF agent and Murray was recorded. On the recording, the agent can be heard asking Murray whether he wishes to waive his rights: "is it your choice now," he asks, "to retract your [earlier waiver] and you want to talk without an attorney present?" Murray responds: "yes, if you['re] gonna let them go, sir," referring to his son and girlfriend. The agent says, "again, it's not up to me. I'm just gonna tell you—I'm gonna ask you a few questions, and that's gonna determine—probably—I'm gonna tell the, uh, Atlanta Police Department, and that's gonna determine whether they [his son and girlfriend] are held culpable and charged with it."

At this point the agent had not promised Murray anything and had said to him that waiver or confession would not necessarily protect his family. Murray, of course, now wants to paint the picture that he waived

his rights and incriminated himself because doing so would spare his family. But if that was his motivation, based on this portion of the conversation it was only because he believed it to be true—not because the agent convinced him it was so. And without coercive conduct *on the part of the police*, a waiver is not involuntary. *See Connelly*, 479 U.S. at 167.

The agent proceeded to tell Murray to be truthful, and that he should not "sit here and tell me that you want to take the charge" to protect his family if doing so would not be truthful. He asked Murray about the gun the police found in his home; Murray said he knew the gun, described it, and said it was his. He then again insisted on absolving his family: "they didn't know nothing about the bag in there [that contained the gun and the drugs], they didn't know nothing about none of that in there."

The agent next said to Murray: "that's what I'm asking you, what was in the bag? And that way, if they [his son and girlfriend] don't know what was in the bag, then that—then it's all you, and they can't be charged with it." Murray then said the bag contained marijuana and a gun.

Murray seizes on this moment in the interrogation. He says that by making that statement, the ATF agent "was not a neutral party" and was "advocating a position," namely "manipulating" Murray into waiving his

right to counsel and incriminating himself by preying on his fear for the well-being of his son and girlfriend.

To be sure, a police officer questioning a suspect is not a neutral party, and he is advocating a position: he is seeking a confession or information about the criminal activity he believes to be afoot. But there is nothing untoward about that. So long as his statements to the suspect do not amount to coercion, the suspect's waiver can be voluntary. *Connelly*, 479 U.S. at 163-64.

Nevertheless, this is the closest the agent came to coercing Murray into his confession. He told Murray that if he took ownership of the contraband his son and girlfriend could not be charged. That may seem, at first blush, to be coercive. But an officer's statement that a suspect's family member will be arrested unless he confesses is not coercive if the officer has probable cause to effect the threatened arrest(s). *See Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (concluding that police statements that the suspect's girlfriend would be prosecuted unless he confessed were not coercive because police had probable cause to arrest her); *United States v. Johnson*, 379 F. App'x 964, 969 (11th Cir. 2010) (same).

Here, the police found contraband in a home in which Murray, his girlfriend and his seventeen-year-old son lived. That created probable cause to arrest any or all of them. *See United States v. Clay*, 355 F.3d 1281, 1284 (11th Cir. 2004) (explaining that constructive possession is sufficient to prove illegal possession of drugs); *United States v. Harris*, 20 F.3d 445, 453-54 (11th Cir. 1994) (holding that the defendant's "unrestricted access to the home permitted the jury to reasonably infer that he exercised control over the house and therefore maintained constructive possession of the cocaine found at the house").

Explaining that fact to Murray was not coercive because it was the truth. *See United States v. Myers*, No. 1:08-cr-169-TWT, 2009 WL 579389, at *6 (N.D. Ga. Mar. 5, 2009) ("In this case, Detective Harris truthfully advised Defendant that his girlfriend's status hinged on whether the cocaine found in their home belonged to her, whether she benefitted from the drugs, and whether she was the 'main player.' These statements do not render Defendant's confession involuntary."). Accordingly, even if the ATF agent convinced Murray to confess in order to save his son and girlfriend from prosecution—which the Court does not believe he did—

doing so was not coercive and thus did not render his waiver invalid or his confession inadmissible.

Murray's waiver of his right to counsel was knowing, intelligent and voluntary. His incriminating statements are thus admissible. Murray's objections to this portion of the R&R will be overruled, and it will be adopted as the Court's order.

## IV. Conclusion

The Court ADOPTS AS ITS ORDER the R&R [8]. Defendant's objections to the R&R [64, 66] are OVERRULED. Defendant's motions to suppress [10, 11, 20] are DENIED. Defendant's motion for a de novo hearing [67] is DENIED.

IT IS SO ORDERED this 5th day of June, 2014.

Timothy C. Batten, Sr.
United States District Judge